### JOHNSON et al. v. ALEXANDER et al.

(Supreme Court, Appellate Division, First Department. December 8, 1899.)

PARTNERSHIP.

> A., C., and others agreed that A. should furnish the use of a lot; that C. should erect thereon a grand stand; that the others should attend to disposal of seats and other privileges, and the general management of the business; that the receipts should be paid to one of them, as treasurer, who should, on the audit of two of them, pay for lumber and services rendered by others than the parties, and that the balance should be divided among them in certain proportions; and that C. should thereafter have the lumber, he removing it at his own expense. *Held,* that the parties were partners, as to third persons, including the persons furnishing the lumber, though it was ordered before the agreement was signed, it being delivered thereafter.

Appeal from trial term, New York county.

Action by Russell Johnson and another, composing the firm of Johnson Bros., against Howard T. Alexander and others. From a judgment entered on dismissal of the complaint on a trial before a jury, plaintiffs appeal. Reversed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PAT-
TERSON, O'BRIEN, and INGRAHAM, JJ.

Carlisle Norwood, for appellants.

Edgar J. Kohler, for respondent Allen.

George S. Coleman, for respondents Alexander and others.

INGRAHAM, J. The liability of the respondents depends upon
the relation which they assumed to those dealing with them, and
largely upon the construction to be given to an agreement between
them which contemplated the erection of a stand upon certain
premises in the city of New York, and the division of the profits
arising from the use of the stand. The dedication of the monument
to Gen. Grant, which included a parade, having been arranged for
April 27, 1897, the erection of stands from which to review that
procession had been a question largely discussed; and these de-
fendants entered into an agreement which contemplated the erec-
tion of a stand upon the line of march. This general understand-
ing seems to have been entered into some time prior to April 15,
1897; the defendant Allen having procured a lease of some prem-
ises on the corner of 119th street and Riverside Drive, upon which
the stand was to be erected. Chatterton, one of the defendants,
testified:

"I could not say the exact date when I first made arrangements with the
defendants Alexander, Coyne, and Tackaberry to have part in this grand stand
at 119th street. The exact date I could not swear to, but I presume it was
around the 10th or 12th. It was before I filed those specifications. And what-
ever agreement I had with them was subsequently embodied in the written
agreement I have referred to."

There was some dispute between Chatterton and Allen as to the
disposition of the lumber that was to be used in the erection of the
stand, and it would seem that the execution of the agreement was
delayed until April 19, 1897, because of this dispute; but the terms
of the agreement, except in this particular, seem to have been set-
tled at the time named by the witness. On April 19, 1897, the
agreement was executed. By the agreement, Chatterton was party
of the first part, and the other defendants were parties of the sec-
ond part. The agreement recites: That Allen had theretofore
leased a plot of land on the northeasterly corner of Riverside Drive
and 119th street. That Chatterton desired to erect a grand stand
on the front part of said premises for the accommodation of persons
wishing to view the parade on the occasion of the dedication of the
Grant Monument on April 27, 1897. That Allen had leased the
said premises to the first party for the purpose aforesaid, and that
Alexander, Coyne, and Tackaberry, parties of the second part,
had rendered services in securing said lease for Chatterton, and
would render other services. That Chatterton, in consideration of
the lease, agreed that he would erect upon the premises a grand
stand with a seating capacity of 8,000, and would have the same in
readiness before the morning of April 27, 1897. That "the cost of
material and labor, and all of the expenses incurred in erecting the
said stand and taking down and replacing the signboard [was] to

be assumed by the first party [Chatterton], but to be repaid to him out of the gross receipts from the sale of seats and other privileges on said stand, as hereinafter provided." That Allen confirmed the oral lease of the said premises theretofore made by him to the said first party for the purpose aforesaid. That the remaining parties of the second part, the said Alexander, Coyne, and Tackaberry, agreed to sell seats and other privileges on said stand. That out of the gross receipts from the sale of seats and other privileges in connection with said stand there should be paid: First, the cost of the lumber, other materials, labor, and all other expenses incurred by the first party in and about the erection of the said stand; second, the expenses of ushers, police, watchmen, and other attendants in and about the said stand prior to and on the day and night of the said parade; third, all cost of advertising and all other incidental expenses incurred by any of the parties to the agreement in connection with the premises. "The balance of the gross receipts shall constitute the net profits, and shall be divided in the manner following; that is to say: $42\frac{1}{2}\%$ thereof shall belong and be paid to the party of the first part, as compensation for his services in building and supervising the said stand; $20\%$ thereof shall belong and be paid to the said Allen, as compensation for the lease of said premises; and $12\frac{1}{2}\%$ thereof shall belong and be paid to each of the remaining parties hereto, the said Alexander, Coyne, and Tackaberry, as compensation for their services heretofore rendered and to be rendered in connection with the premises." The agreement then provided, as to the duties of the various defendants, that Tackaberry was to act as treasurer for the parties to the agreement; that all money received from the sale of seats and other privileges in connection with the said stand should be turned over to the said treasurer, and that all expenses in connection therewith should be paid by the said treasurer upon vouchers duly approved by Chatterton and Alexander, and that the sale of seats and all other privileges should be under the supervision and charge of the said parties of the second part, it being understood that the said Chatterton and Tackaberry should be the managers for and on behalf of all the parties to the agreement; that a settlement under this agreement should be made on the 28th day of April, 1897; that all lumber and other materials used in the construction of said stand should at all times belong to, and be the property of, the party of the first part (Chatterton), and that the party of the first part should remove at his own expense the lumber and other materials, and clear up the premises, and restore them, as near as possible, to the condition in which they were before the erection of the said stand; that, until all cost and expenses of construction were repaid to the party of the first part (Chatterton), no other expenses should be paid out of the funds in the treasurer's hands.

Prior to the execution of this agreement, and about the 16th of April, an order for the lumber necessary to build this stand had been given by Chatterton, and accepted by the plaintiffs. Before the order was accepted, there was an interview between the plaintiffs'

representative, Chatterton, and Tackaberry, at which Chatterton introduced Tackaberry as being interested with him in connection with the grand stand. Chatterton subsequently testified that he introduced Tackaberry as a partner, and also introduced the defendant Coyne to Johnson as a partner. The plaintiffs' representative testified that at that interview Chatterton explained the situation, and said that Tackaberry was responsible and that Mr. Alexander was responsible; and the plaintiffs' representative then thought that it would be better to get an order accepted by one of these people connected with Chatterton. Chatterton then wrote out an order, dated April 16, 1897, upon Tackaberry, which is as follows: "Please pay to Johnson Bros. their bill for lumber furnished for stand erected on East side of Riverside Drive, running from the north side of 119th street, 354 feet north, as audited by Howard Alexander and myself. W. S. Chatterton." In reply to this order the defendant Tackaberry wrote: "Will accept the above order, when audited by Mr. H. T. Alexander and W. S. Chatterton. F. H. Tackaberry."

The plaintiffs furnished the lumber which was used in the erection of the stand. The value of that lumber, at the agreed price, was $5,324.74, and it was to recover that amount that this action was brought. The action originally was to foreclose a mechanic's lien upon the property, filed by the plaintiffs. Subsequently, by a stipulation, the demand to enforce this mechanic's lien was dropped, and the action was changed into one to recover from these defendants as co-partners. It appeared that all this lumber was delivered to Chatterton and used by him after the formal execution of this agreement on April 19th; and there was evidence to justify a finding by the jury that the lumber was delivered upon the representation by Chatterton that the other parties to the agreement were his partners, or interested with him in the adventure, and were responsible for the payment of the bill for lumber furnished. The written agreement between the parties was not submitted to the plaintiffs or their representatives. All that the plaintiffs knew was that there was a joint adventure or undertaking, in which these parties were interested. The obligations of these parties towards each other is not the question here presented. We are concerned only with the obligation towards third parties, and whether or not this agreement constituted these defendants co-partners or joint adventurers as to third parties supplying or furnishing materials necessary to the successful prosecution of the adventure. It is apparent from an examination of this instrument that the sole object of the adventure was to make a profit, in which the parties to the agreement were to share in the proportions specified. Allen had obtained a lease of the premises, and he contributed that lease to the general stock, and for it he was to receive a percentage of the net profits. Chatterton, who was a dealer, and apparently the only one familiar with the construction of a structure of the character contemplated, was to erect the stand, and in the first instance assume the expenses required for materials and labor; and for his services he was to receive a percentage of the profits. The other parties to the agreement were to render services in disposing of the seats upon the

stand, and other privileges connected therewith, and other services in relation to its management; and for their services they were to receive a proportion of the net profits. It is important to consider the way that the net profits were to be ascertained. No part of the proceeds was to be paid for rent of the premises, for the right to use them was furnished by Allen, as his contribution to the joint adventure, and he was to render no other services for his proportion of the profits. Chatterton was to erect the stand, but the expense that Chatterton incurred in so erecting the stand and furnishing materials was not to be contributed by him, but was to be paid out of the gross receipts; and, until that expense was paid, the agreement expressly provided that no net profits were to be distributed. Chatterton was not to contribute to the joint adventure the material and labor incurred in the construction of the stand, because the expense therefor was to be paid out of the gross receipts, or, in other words, by those jointly interested in the adventure. He was to contribute his services in procuring the materials and labor and in erecting the structure. His contribution to the adventure, therefore, was the rendition of such services; while the other defendants were to contribute their services in disposing of the seats and other privileges of the stand, and the general management of the adventure. The materials used in the erection of the stand, after the parade,—which was provided for in the agreement,—were to belong to Chatterton; but he was required to pay the cost of removing the same, and such cost was not to be a charge upon the gross receipts. The intention of the parties to this agreement is therefore clear. Its object, as before stated, was to secure net profits, to be divided among those interested. The net profits were to be ascertained by deducting all the expenses incident to the adventure, including the cost of furnishing the necessary labor and materials. What, then, are the legal relations of these parties interested in such adventure, and who were to receive the profits, as to third parties?

The rule in this state does not seem to be in doubt. As was said by Chief Justice Ruger in Hackett v. Stanley, 115 N. Y. 627, 22 N. E. 746:

"This agreement does not in express terms purport to form a partnership; neither is the intention to do so disclaimed; and the question is, therefore, whether, in a business carried on under the conditions provided for in the contract, the parties thereto became partners as to third persons."

And in discussing that question the chief judge said:

"The application of the rule that 'participation in profits' renders their recipient a partner in the business from which profits are derived, as to third persons, has been somewhat restricted by modern decisions, but we think that the division of profits must still be considered the most important element in all contracts by which the true relation of parties to a business is to be determined. We think this rule is founded in strict justice and sound policy. There can be no injustice in imposing upon those who contract to receive the fruits of an adventure a liability for credits contracted in its aid, and which are essential to its successful conduct and prosecution. This liability does not, and ought not to, depend upon the intention of the parties in making the contract to shield themselves from liability, but upon the ground that it is against public policy to permit persons to prosecute an enterprise, which, however successful it may for a time appear to be, is sure in the end to result in advantage to its secret promoters alone, and the ruin and disaster of its creditors and others connected with it."

The court then discusses the exceptions to this rule:

"Exceptions to the rule are, however, found in cases where a share in profits is contracted to be paid as a measure of compensation to employers for services rendered in the business, or for the use of moneys loaned in aid of the enterprise; but when the agreement extends beyond this, and provides for the proprietary interest in the profits as a compensation for money advanced and time and services bestowed as a principal in its prosecution, we think that the rule still requires such party to be held as a partner."

In Leggett v. Hyde, 58 N. Y. 275, it appeared that the appellant invested or deposited with a co-partnership a sum of money, for which the appellant was to share in the profits of the business of the firm. His share was to be one-third, demandable by him at the end of the year. Judge Folger, in delivering the opinion of the court, says:

"The prominent and important facts are that he loaned the firm a sum of money, to be employed as capital in its business, and that, therefore, he was entitled to have and demand from it one-third of the profits of its business every half year. In my judgment, there results from this, that Putnam and Henneberger, making use of that money as capital in that business, used it there for the benefit of the appellant, because any return to him for the loan to them must come from the use of it. If not used so that profits were made, he got no return. Further, that he had an interest in the profits, which, while they were anticipatory, was indefinite as to amount, but, when they were realized, was measured and specific as to share. Further, that his interest in them was in them as profits; that is, that he had a right on the lapse of every six months, though having no property in the whole capital, to have an account taken of the business, and a division made of the profits then appearing. * * * He had that interest in the profits, as profits, because he could claim a share of them specifically, as they should appear on each six-months or other accounting of the business of the term then ended, and could then have and demand payment of his share."

And, after examining the authorities in this country and in England, Judge Folger continues:

"There have been from time to time certain exceptions established to this rule, in a broad statement of it; but the decisions by which these exceptions have been set up still recognize the rule that, where one is interested in profits as such, he is a partner as to third persons. These exceptions deal with the case of an agent, servant, factor, broker, or employé, who, with no interest in the capital or business, is to be remunerated for his services by a compensation from the profits, or by a compensation measured by the profits, or with that of seamen on whaling or other like voyages, whose reimbursement for their time and labor is to finally depend upon the result of the whole voyage. There are other exceptions, like tenants of land or a ferry or an inn, who are to share with the owners in results, as a means of compensation for their labor and services. The decisions which establish these exceptions do not profess to abrogate the rule, only to limit it."

This rule, thus stated by the highest court of the state, is the one which is controlling, and which it is our duty to apply. The extent of the rule is well illustrated by the exceptions to it which have been recognized. Thus, the rule is general that participation in profits renders their recipient a partner in the business from which the profits are derived, as to third persons. The exceptions are the cases of agent, servant, factor, broker, or employé, who, with no interest in the business or capital, is to be remunerated for his services by a compensation from the profits, or by a compensation measured by the profits, and where tenants of land

or other real property are to share with the owner in results, as a compensation for their labor and services. The general principle upon which these exceptions have been established is that in such cases the parties have no interest in the profits or business, but simply have adopted a division of receipts as a method of ascertaining the amount of compensation for the services rendered or property used. But where the parties contemplate that profits, as such, should be divided, giving to the persons entitled to receive their proportion of such profits the right to call the remaining persons to account; giving each (one to the other) the right to enforce the agreement as a co-partner, so that the profits, as a whole, vest in the adventurers, to be divided among them in the proportions agreed to,—then, as to third parties, the co-partnership is formed. The application of this rule is further illustrated in Hull v. Barth, 37 App. Div. 359, 55 N. Y. Supp. 1103.

Applying this rule to this particular agreement, it seems to follow that the parties to it were all liable as partners to third parties. Each one made his contribution to the joint adventure, either by a right to use the property, or by services to be rendered. Each one had his particular part to perform. The receipts from the whole adventure were to be paid to the treasurer, and the disbursements necessary for the adventure were to be paid upon the audit of two of the members. The balance remaining—in other words, the net profits—was to be divided at the end of the adventure. That either of the joint adventurers could have demanded an accounting, and could have demanded and enforced his right to his share of any profits which had been realized in an action for an accounting, could not be doubted. What more was necessary to constitute such a co-partnership? There was no express statement that either party should be ultimately responsible for losses, if losses there should be, but it is not claimed that such an express agreement was necessary. The law imposes such liability.

But it is claimed by the respondents that, even if there was a co-partnership, only the defendant Chatterton would be liable for the lumber furnished by these plaintiffs. It is not necessary for us to determine whether or not that would be true as between the parties to the agreement. We are dealing now with the liability of these joint adventurers to third parties who furnished the labor and material necessary for the adventure. As to such third parties, it was entirely immaterial what agreement the parties, as between themselves, had made. It is quite clear that under the agreement Chatterton was not to furnish this erected stand as his contribution to the partnership. He was to build and erect the stand, and, as between the parties, was to assume the obligation of procuring the lumber and labor to erect it, but he was not to contribute the stand as his share to the joint adventure, because it was to be paid for out of the proceeds of the joint adventure; and while, under the agreement, he might have been responsible to the other parties to it for a failure to procure such material and labor, his act in procuring them, as to third parties, was the act of all the associates, and they were liable for the obligations incurred by

him. The defendant Allen is in the same position as the other defendants. Assuming that the lumber was ordered before the written agreement had been signed, it was delivered afterwards. It was a liability incurred for the benefit of the co-partnership, and was for material necessary for the prosecution of the enterprise. The cost of the lumber was to be paid for out of the receipts, and all the co-partners were responsible for the liability incurred in its purchase.

The view that we have taken renders it unnecessary to discuss the other questions argued upon this appeal. We think a fair construction of the agreement made all the parties to it liable to third parties for indebtedness incurred in carrying out the adventure, and for that reason the dismissal of the complaint was error.

The judgment should be reversed, and a new trial ordered, with costs to the appellants to abide the event. All concur.